## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GARY SMITH,                                )
                                           )
      Plaintiff,                      )
                                           )
vs.                                        )
                                           )    **Case No. 3:18-cv-02190-GCS**
SCOTT THOMPSON, KAREN                      )
JAIMET, CHRISTINE BROWN,                   )
MICHAEL SCOTT, ALBERTO                     )
BUTALID, and WEXFORD HEALTH                )
SOURCES, INC.,                             )
                                           )
      Defendants.                     )

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Gary Smith, an inmate in the custody of the Illinois Department of Corrections ("IDOC") currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), brought suit against Defendants Thompson, Jaimet, Brown, Scott, Butalid, and Wexford Health Sources, Inc. ("Wexford") pursuant to 42 U.S.C. § 1983 on December 19, 2018. (Doc. 1). In his complaint, Plaintiff brings one count against all defendants for deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. (Doc. 10, p. 3). Specifically, Plaintiff alleges that Defendants Wexford, Scott, and Butalid (the "Wexford Defendants") failed to properly diagnose and treat his severe uvula pain, including by referring Plaintiff to a specialist. *Id*. Plaintiff includes in this count a claim that Wexford maintains an unconstitutional practice of denying referrals to outside specialists. *Id*. at p.

5. He also alleges that Defendants Jaimet and Brown (the "IDOC Defendants") ignored his grievances detailing his pain. *Id*.

The Wexford Defendants filed a motion for summary judgment on November 1, 2021, (Doc. 56, 57), and the IDOC Defendants filed a motion for summary judgment on the same day. (Doc. 58, 59). Plaintiff timely responded to both motions. (Doc. 61, 62). For the reasons delineated below, the motions for summary judgment are **GRANTED.**

## FACTUAL BACKGROUND

Plaintiff first presented to nursing sick call with a sore throat on July 18, 2016. (Doc. 57, p. 2). At that time, his throat displayed mild swelling and redness around the uvula; his nurse put in a referral for him to see a doctor for his throat pain. *Id*. Two days later, on July 20, 2016, Plaintiff saw Defendant Scott, who diagnosed him with pharyngitis. *Id*. Defendant Scott prescribed Plaintiff chlorphenamine antihistamine, Motrin, and a warm salt water gargle. *Id*. He also told Plaintiff to return to sick call when needed. *Id*.

On January 9, 2017, Plaintiff returned to sick call, stating that he had the same problem as he experienced in July, *i.e.*, a sore throat, swelling, and a "tail" on his uvula. (Doc. 57, p. 3). Three days later, on January 12, 2017, Plaintiff saw a non-defendant nurse practitioner and reported that he had experienced this sore throat since June 2016. *Id*. The nurse practitioner ordered laboratory work and an x-ray of Plaintiff's neck; she also directed Plaintiff to continue the gargles and to return to the medical unit as needed. *Id*. The x-rays did not return any unusual findings, and his laboratory results were within normal limits. *Id*.

Plaintiff reported feeling "something" in his throat again on January 23, 2017, at which time the nurse practitioner observed a thin, tail-like protrusion on Plaintiff's uvula. (Doc. 57, p. 3). She referred Plaintiff to the physician call line, and on February 3, 2017, Plaintiff again saw Defendant Scott. *Id*. Defendant Scott observed the protrusion, but also noted that Plaintiff had no hoarseness, coughing, or wheezing. *Id*. He diagnosed Plaintiff with gastroesophageal reflux ("GERD") and prescribed Plaintiff Prilosec. *Id*.

Plaintiff next returned to nursing sick call for pain in his throat on March 15, 2017. (Doc. 57, p. 4). Though the nurse observed his protrusion and referred him to a physician, he did not see another provider until April 8, 2017, at which time he saw a physician's assistant. *Id*. The physician's assistant observed the protrusion and scheduled Plaintiff to see a doctor. *Id*. However, Plaintiff did not see a doctor until April 30, 2017, at which time he met with Defendant Butalid. *Id*.

Prior to his meeting with Defendant Butalid, on April 25, 2017, Plaintiff filed a grievance which explained his consistent throat pain and requested a referral to an ENT. (Doc. 59, Exh. G, p. 28). Plaintiff specifically noted his disagreement with Defendant Scott regarding Defendant Scott's diagnosis of Plaintiff's throat pain as an "allergy problem." *Id*. at p. 29. Plaintiff was particularly frustrated because the chlorpheniramine maleate prescribed for his allergies did not treat his condition during the ninety days he tried the medication. *Id*. Plaintiff also explained that Defendant Scott refused to refer him to someone who would surgically treat his protrusion, stating that "when you get out of

prison, you can have it surgically taken care of, but you are not going to get it done here." *Id.*

Plaintiff's counselor denied this grievance on April 27, 2017, noting that the Health Care Unit Administrator, Defendant Brown, found that Plaintiff was treated "per the assessment and judgment of the providers." (Doc. 59, Exh. G, p. 28). Although Defendant Jaimet bore ultimate responsibility for reviewing grievances as warden of Pinckneyville, she delegated the responsibility for review to Defendant Thompson. (Doc. 62, p. 1). Defendant Jaimet explained that she did not personally review Plaintiff's grievances and that she had no recollection of Plaintiff's case. (Doc. 59, p. 9). Though Plaintiff received a July 5, 2017 letter from his grievance officer denying the grievance, there is no signature from the grievance officer or concurrence from the Chief Administrative Officer, Defendant Jaimet, on that grievance. (Doc. 59, Exh. G, p. 31).

Defendant Butalid noted that Plaintiff's uvula was congested and swollen. (Doc. 57, p. 4). However, he did not see the protrusion on Plaintiff's uvula. *Id.* For treatment, Defendant Butalid prescribed Tylenol; he also submitted a Medical Special Services Referral and Report to Wexford for an ear, nose, and throat ("ENT") consultation. *Id.* On May 4, 2017, Defendant Butalid met with non-defendant Dr. Stephen Ritz[1] to discuss Plaintiff's pain and difficulty swallowing. *Id.* at p. 5. The two doctors placed Plaintiff on an alternative treatment plan including antihistamines and an H2 blocker, which

---

[1]    Though Dr. Ritz is not a defendant in his personal capacity, he is the Corporate Utilization Management Medical Director for Defendant Wexford. (Doc. 59, p. 5). Wexford grants or denies referrals through the utilization management committee. *Id.*

included Prilosec. *Id*. The doctors reasoned that the antihistamines would treat Plaintiff's condition if it was allergies, while the H2 blocker would treat his condition if it was GERD. *Id*. After the conclusion of this treatment plan, Wexford denied the referral to an ENT on May 8, 2017. *Id*.

Before Plaintiff began this medication regimen, he saw Defendant Butalid again on May 25, 2017. (Doc. 57, p. 5). At that time, Defendant Butalid diagnosed him with pharyngitis and prescribed the antibiotic Keflex and a barium swallow, which was intended to treat Plaintiff's pain and difficulty with swallowing. *Id*.; *see also* (Doc. 59, p. 5). He also told Plaintiff to follow up with the healthcare unit in two weeks. (Doc. 57, p. 5). Despite this change in diagnosis and potential treatment, when Defendant Butalid met with Dr. Ritz again on June 1, 2017 to discuss Plaintiff's treatment plan, the two doctors denied the referral for a barium swallow and instead started Plaintiff on the alternative treatment plan and medications initially discussed in May. *Id*. Defendant Butalid knew that allergies would not cause the growth on Plaintiff's uvula, though they could cause some inflammation. (Doc. 57, Exh. C, 18:15-24). Dr. Butalid speculated that this was the reason why Dr. Ritz wanted to treat Plaintiff with these medications. *Id*. Defendant Butalid did not appeal the decision to deny the referral to an ENT or the current treatment plan within Wexford or the IDOC. (Doc. 62, p. 3). Dr. Ritz construed the lack of an appeal as Defendant Butalid's agreement to the alternative treatment plan. *Id*.

Plaintiff next saw Defendant Butalid on August 24, 2017. (Doc. 57, p. 6). At that time, Defendant Butalid noted that Plaintiff appeared to be doing better with his Keflex

prescription, *i.e.*, he was better able to breathe, and his throat swelling improved. *Id.* Nevertheless, Plaintiff's throat appeared congested, and the protrusion remained. *Id.*

On November 30, 2017, Defendant Butalid saw Plaintiff again, and he diagnosed Plaintiff with an elongated uvula. (Doc. 57, p. 6). He continued prescribing Plaintiff antihistamines and H2 blockers; however, he also submitted a referral to an ENT and ordered lab work for Plaintiff. *Id.* Dr. Ritz reviewed Plaintiff's case on December 6, 2017, but he decided to continue the alternative treatment plan because there were no objective findings which supported Plaintiff's claims that he had difficulty swallowing. *Id.* Specifically, Plaintiff continued to purchase spicy foods, and Plaintiff had gained weight over the course of his complaints. *Id.* However, Dr. Ritz did consider placing Plaintiff in the infirmary to evaluate his symptoms. *Id.*

Plaintiff stayed in the infirmary from December 6 through December 20, 2017. (Doc. 57, p. 7-9). During that time, Plaintiff's objective vital signs, including his ability to eat, did not indicate any difficulties. *Id.* However, Plaintiff continued to subjectively complain of difficulty swallowing, difficulty breathing, and throat pain. *Id.*

On December 28, 2017, Plaintiff filed a second grievance describing his lack of medical care. (Doc. 59, Exh. G, p. 25). In that grievance, Plaintiff explained that he had difficulty breathing, and that each of his doctors informed him of his enlarged uvula. *Id.* He also explained that Defendant Scott refused to refer him to surgery, while Defendant Butalid noted that he needed to see an ENT but denied his referrals to an ENT despite this acknowledgement. *Id.* at p. 26. He also explains that he had followed all of his

doctors' orders, but he still experienced pain and difficulty breathing. *Id.* He again requested a referral to an ENT. *Id.* at p. 25.

Plaintiff's counselor noted that Defendant Brown sent an appeal of Wexford's denial of an outside referral to the Office of Health Services. (Doc. 59, Exh. G, p. 25). However, Wexford continued to find that an outside referral was not medically necessary. *Id.* As Chief Administrative Officer, Defendant Jaimet checked a box on the response section of the grievance stating "I concur." *Id.* at p. 24. She did not provide any comments to the grievance. *Id.* The small letters "ST" appear in a circle near Defendant Jaimet's signature, indicating that Defendant Thompson signed the grievance on Defendant Jaimet's behalf. *Id.*

On February 1, 2018, Plaintiff saw Defendant Butalid for his throat complaints for the last time. (Doc. 57, p. 9). Defendant Butalid noted that Plaintiff reported less discomfort than in previous visits. *Id.* He prescribed Plaintiff antihistamines, an H2 blocker, and medication for Plaintiff's complaints of dizziness. *Id.*

Although Plaintiff was transferred to the Murphysboro Life Skills Re-Entry Center ("Murphysboro") on February 24, 2020, Wexford continued to oversee his care. (Doc. 57, p. 10). When Plaintiff complained again of pain in his uvula, his treating physician at Murphysboro submitted a referral for a CT scan of Plaintiff's neck; Wexford approved this scan on October 26, 2020. *Id.* That same physician submitted Plaintiff for a referral to an ENT on June 2, 2021; however, this referral was not subject to collegial review because

that process was discontinued by this time. *Id.*; *see also* (Doc. 61, p. 4). The ENT recommended a partial uvulectomy to treat the elongated uvula. *Id.* at p. 11.

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

DISCUSSION

I.    **Whether Defendants Scott and Butalid were deliberately indifferent to Plaintiff's throat condition**

A prisoner seeking to establish that the medical care he received in prison was so insufficient as to violate his Eighth Amendment rights must prove that: (1) he had an

objectively serious medical need, and (2) the defendant prison official was deliberately indifferent to that need. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). *See also Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996); *Thomas v. Walton*, 461 F. Supp.2d 786, 793 (S.D. Ill. 2006). In order to find that a defendant was deliberately indifferent, there must be a condition that required treatment, knowledge on the part of the health care provider of an excessive risk to health or safety, and a decision to disregard that risk. *See Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994)(citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). The Wexford Defendants first contend that Plaintiff's throat condition was not an objectively serious medical need. (Doc. 57, p. 15).

A medical condition is objectively serious if a physician has determined that treatment is mandated, or if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Johnson v. Snyder*, 444 F.3d 579, 584-585 (7th Cir. 2006)(citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)), overruled on other grounds in *Hill v. Tangherlini*, 724 F.3d 965, 968 n.1 (7th Cir. 2013). An objectively serious condition results if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain[.]" *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Not all medical conditions are sufficiently serious to implicate the Eighth Amendment; the failure to dispense medicine for "minor aches and pains" does not violate the Constitution. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). For example, in *Knox v. Walter*, the plaintiff alleged that he sustained injuries during a shakedown of his

cell house, including cuts to his wrist, pain and swelling in his neck and shoulders, and feelings of lightheadedness. No. 20-3344, 2022 WL 61432, at *1 (7th Cir. Jan. 6, 2022). However, when the defendant nurse saw the plaintiff, she found no swelling, weakness, or numbness. *Id.* The district court found that the plaintiff's superficial cuts and dizziness were not objectively serious, though his claims of severe pain left a question of material fact for the jury. *See Knox v. Butler*, Case No. 17-cv-494-SMY, 2020 WL 6701148, at *2 (S.D. Ill. Nov. 13, 2020). The Seventh Circuit upheld this finding on appeal. *Walter*, 2022 WL 61432, at *1-2.

In contrast, withholding pain medication from a patient with cancer, ignoring unmedicated epilepsy, and leaving untreated an infected cyst which caused excruciating pain have each been considered sufficiently serious to support a claim for deliberate indifference. *See Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999); *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998); *Gutierrez*, 111 F.3d at 1373. Chronic pain can also constitute an objectively serious medical condition when a reasonable doctor or patient would find that pain important and worthy of treatment, or when it interferes with the plaintiff's daily activities. *See Gutierrez*, 111 F.3d at 1373 (internal citations omitted). A plaintiff's own reports of terrible pain may create a genuine question as to whether a condition was objectively serious. *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019).

The Wexford Defendants argue that Plaintiff's throat condition was not an objectively serious medical need because his symptoms were intermittent. (Doc. 57, p.

15). Indeed, Plaintiff did not report symptoms between July 2016 and January 2017, August 2017 and November 2017, and February 2018 and October 2020. *Id*. Furthermore, the Wexford Defendants note that Plaintiff did not lose weight or demonstrate difficulty eating during this period. *Id*. Plaintiff never fainted or reported choking, or otherwise indicated that his condition impacted his daily activities. *Id*.

Plaintiff reported in his grievances that he experienced difficulty swallowing and difficulty breathing. (Doc. 59, Exh. G, p. 25). He explained that he would often wake up from sleep because he was choking and unable to breathe. *Id*. He also stated that he experienced "constant" discomfort in his throat. *Id*. at p. 28. Overall, Plaintiff believed that this condition was "endangering [his] life." *Id*. at p. 31.

Despite Plaintiff's self-reports, this case is more similar to *Knox* than to the cases in which courts found the pain to be a sufficiently serious medical need. Although Plaintiff reported pain and difficulty with breathing and eating, there is no evidence in the record that this pain or these difficulties were so severe as to interfere with Plaintiff's daily life. While Plaintiff experienced difficulty with eating, he did not report missing meals; while he described waking up from sleep occasionally, there is no indication that Plaintiff was unable to continue his daily activities due to lack of sleep.

Plaintiff encourages the Court to rely on *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005). (Doc. 61, p. 4). In that case, the Tenth Circuit found that the plaintiff's severe chest pains in the days preceding a heart attack constituted an objectively serious medical condition. *Mata*, 427 F.3d at 755. This case is not binding on this court, and the Court does not find

it persuasive. The plaintiff in *Mata* rated her pain an "eight" out of ten, and this pain caused her to miss work and assignments throughout her day. *Id*. at 750. There is no evidence in the record indicating that Plaintiff likewise rated his pain as high or otherwise felt his life was adversely impacted by his pain. As Plaintiff's pain did not constitute an objectively serious medical need, the Court must grant summary judgment in favor of Defendants Scott and Butalid.

However, even if Plaintiff's throat condition was an objectively serious medical need, summary judgment in favor of the defendants would nevertheless be warranted. Assuming, *arguendo*, that Plaintiff's throat pain amounts to an objectively serious medical need, the Court next turns to consider the second prong, *i.e.*, whether the defendant prison official was deliberately indifferent to that need. *See Arnett*, 658 F.3d at 750. In order to be deliberately indifferent to an objectively serious medical need, a defendant must know of and disregard an excessive risk to the plaintiff's health. *See Greeno*, 414 F.3d at 653. The defendant prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837-838 (1994). Moreover, "[d]eliberate indifference implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." *Thomas*, 461 F. Supp.2d at 793 (citing *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), abrogated on other grounds by *Haley v. Gross*, 86 F.3d 630, 645 n.34 (7th Cir. 1996)). Deliberate indifference is more than

negligence; instead, the proper standard "approaches intentional wrongdoing." *Johnson*, 444 F.3d at 585. *See also Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012)(requiring a plaintiff to show that defendants had a near "total unconcern" for the plaintiff's welfare). Accordingly, the failure to alleviate a risk officials should have perceived, but did not, is not a violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 826.

Persisting in a course of ineffective treatment constitutes cruel and unusual punishment in violation of the Eighth Amendment when a defendant doctor chooses the "easier and less efficacious treatment" without exercising professional judgment. *Arnett* 658 F.3d at 754 (internal citations omitted). *See also White v. Napoleon*, 897 F.2d 103, 109 (3rd Cir. 1990)(finding a violation of the Eighth Amendment where a defendant doctor insisted on continuing the same course of treatment when that doctor knew the treatment was painful and ineffective). The standard is not whether a plaintiff took steps to request a specific, different course of treatment. Instead, the proper analysis considers whether the defendant doctor knew he was providing deficient treatment. *See Petties v. Carter*, 836 F.3d 722, 726 (7th Cir. 2016).

There is no evidence in the record that either Defendant Scott or Defendant Butalid failed to exercise professional judgment in favor of an easier and less efficacious treatment. Defendant Scott had no indication that his initial prescription, including the antihistamine and a saltwater gargle, was not working until roughly five months after Plaintiff first saw him; when Plaintiff returned in January 2017, Defendant Scott changed his approach to treating Plaintiff. (Doc. 57, p. 3). There is also no indication in the record

that Defendant Scott had knowledge that this new treatment was not working, let alone that Defendant Scott chose a course of treatment for a reason other than his best professional judgment.

Similarly, Defendant Butalid continued to address Plaintiff's symptoms with a course of treatment predicated on the exercise of his professional judgment. When Plaintiff first saw Defendant Butalid, the doctor prescribed Plaintiff pain medication and referred him to an ENT. (Doc. 57, p. 4). After discussing the condition with Dr. Ritz, Defendant Butalid prescribed medications to target the two predicted causes of Plaintiff's discomfort: an H2 blocker for GERD and an antihistamine for allergies. *Id*. at p. 5. Despite this dual-pronged approach to treatment, Defendant Butalid continued to listen to Plaintiff's complaints, and again tried another approach to treatment when Plaintiff returned on May 25, 2017. *Id*. This time, Defendant Butalid prescribed an antibiotic; this prescription seemed to be effective, as Plaintiff stated he was in less discomfort during his next visit. *Id*. at p. 6. Plaintiff again reported that he was in less pain the final time he saw Defendant Butalid on February 1, 2018, giving the doctor no reason to suspect that his prior treatments were ineffective. *Id*. As the evidence in the record indicated that Defendants Butalid and Scott exercised their professional judgement in treating Plaintiff, summary judgment for the Wexford Defendants is appropriate in this case.

## II. Whether the IDOC Defendants were deliberately indifferent to Plaintiff's serious medical needs

Plaintiff's contention against the IDOC Defendants rests on their responses to his grievances. Specifically, Plaintiff asserts that Defendant Jaimet and Defendant Brown

knew of the Wexford Defendants' failure to provide Plaintiff medical care through his grievances, but that the IDOC Defendants did not take action to remedy the situation despite that knowledge. (Doc. 62, p. 2). However, the IDOC Defendants assert that Defendant Jaimet never knew of Plaintiff's complaints, as she never reviewed his grievances. (Doc. 59, p. 14). Equally, Defendant Brown took action to appeal Wexford's denial of Plaintiff's referral to an ENT, demonstrating that she lacked the state of mind necessary to be deliberately indifferent to Plaintiff's medical needs. *Id.*

When a prisoner is under a medical expert's care, non-medical prison officials are "generally justified" in presuming that the prisoner is receiving adequate medical treatment. *Arnett*, 658 F.3d at 755 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)). If an official believes that a prisoner is receiving medical care, that official is not obligated to take further action, even if they are aware of the prisoner's serious medical condition. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Requiring otherwise would undermine the general principle that prison officials are "responsible for their own misdeeds," but not responsible for the misdeeds of another. *Id.* This standard and its underlying rationale also applies between supervisors and their subordinates; an inmate may not demonstrate a non-medical official's deliberate indifference by showing mere negligence in that official's failure to detect and prevent a subordinate's misconduct. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

However, if an official has actual knowledge of a subordinate's or doctor's mistreatment of an inmate and still declines to act, that official may be deliberately

indifferent to the inmate's serious medical needs. *See Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017); *Johnson v. Doughty,* 433 F.3d 1001, 1012 (7th Cir. 2006); *Greeno,* 414 F.3d at 655–656. In order to provide officials with actual knowledge, a prisoner must communicate an underlying issue to the officials sufficiently to alert them to an excessive risk to the prisoner's health. *See Vance*, 97 F.3d at 993 (quoting *Farmer*, 511 U.S. at 837). Once an official is alerted to such a risk, the refusal to exercise the authority of the official's office may reflect deliberate disregard to the inmate's serious medical needs. *See Arnett*, 658 F.3d at 756.

The test for determining whether a defendant had such knowledge has two prongs: first, the defendant must be aware of facts from which an inference could be drawn that a substantial risk of harm exists; second, the defendant must also draw this inference. *See Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015)(citing *Farmer*, 511 U.S. at 837). Plaintiff's grievances arguably provided facts from which the IDOC Defendants could draw an inference that Plaintiff was exposed to a substantial risk of harm. Grievances and other correspondences with prison officials only serve as evidence of those officials' actual knowledge when the content and manner of the communications give the officials sufficient notice to alert them to an excessive risk to an inmate's health or safety. *See Vance*, 97 F.3d at 993 (citing *Farmer*, 511 U.S. at 837). Here, Plaintiff consistently complained of Defendant Scott's refusal to refer him to a surgeon, as well as the alleged ineffectiveness of Defendant Butalid's treatment for Plaintiff's throat condition. (Doc. 59, Exh. G, p. 28).

Those who review grievances may be liable for constitutional deprivations for which they bear no personal responsibility when the grievances provide the required notice and the reviewing officials nevertheless fail to exercise their authority to intervene on an inmate's behalf and rectify the situation. *See Perez v. Fengolio*, 792 F.3d 768, 782 (7th Cir. 2015). Even if the plaintiff lacks evidence that a reviewing official read or received the grievances at issue, the Court may infer a reviewing official's actual knowledge of the situation outlined in a grievance based on the number of grievances filed and the official's systematic ignoring of requests for redress. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). A warden delegating authority to a subordinate to respond to grievances is not a sufficient means of avoiding liability for the failure to intervene on the basis of a lack of actual knowledge of the plaintiff's complaints. *See Dixon v. Brown*, Case No. 3:16-cv-01222-GCS, 2021 WL 1171657, at *8 (S.D. Ill. Mar. 29, 2021). To the contrary, such delegation "carr[ies] the same consequences as actual knowledge." *Id.* (internal citations omitted).

While the IDOC Defendants had actual knowledge of Plaintiff's complaints, either through directly investigating the grievance or through the policy of delegating the responsibility to review grievances to a subordinate, there is no evidence that the IDOC Defendants chose to do nothing in light of that knowledge. Instead, Defendant Brown investigated the grievance and appealed the denial of a referral to an ENT through the appropriate channels at Wexford. (Doc. 59, p. 14). Her response, as reported to the

grievance officer on Plaintiff's grievance responses, directly contradicts Plaintiff's assertion that she failed to "follow-up" on his complaints. *See* (Doc. 62, p. 3).

Although Wexford did not change its decision to deny Plaintiff's referral after Defendant Brown's appeal, this is not sufficient for finding Defendant Brown deliberately indifferent. Prison administrators are not required to exceed the divisions of the bureaucracy in which they work; if an administrator takes action to remedy a wrong which the responsible party ultimately ignores, they are not responsible for that wrong when it occurs. *See Burks*, 555 F.3d at 595. Defendant Brown cannot be held responsible for Wexford's failure to refer Plaintiff to an ENT because she took the action available to her to remedy the situation. She lacked the power to pursue Plaintiff's claims beyond this response. (Doc. 59, p. 9).

Furthermore, Defendant Thompson, and through him, constructively, Defendant Jaimet, had reason to believe that Wexford had twice reviewed Plaintiff's complaints and found that referral to an ENT was unwarranted, outside of Defendant Smith's or Defendant Butalid's purview. *See, e.g.*, (Doc. 59, Exh. G, p. 25)(containing the grievance officer's report of Defendant Brown's findings in the appeal of the grievance to the Chief Administrative Officer). Unlike Defendant Brown, Defendant Thompson now had additional support for relying on Wexford's medical judgment, as the denial of a referral had survived an additional level of review. As Plaintiff complained only of potential misdeeds from Defendants Butalid and Scott in his grievances, Defendant Thompson and Defendant Jaimet had no reason to believe the review of Defendant Brown's appeal by

Wexford was tainted with the same ill-will Plaintiff initially described. They were therefore justified in relying on Wexford's medical opinion in denying the referral to an ENT and were not deliberately indifferent to Plaintiff's reported lack of medical care.

### III.    Whether Wexford maintains an unconstitutional practice of denying inmates specialist referrals

The doctrine of *respondeat superior* does not apply to suits filed under § 1983. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014)(citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). In *Monell v. Dep't of Social Services of the City of New York*, however, the Supreme Court held that a municipality may be liable under § 1983 for constitutional violations resulting from a policy or custom of the municipality. 436 U.S. 658, 690–691 (1978). The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services, such as Defendant Wexford. *See Shields*, 746 F.3d at 789. Precedent establishes that a private corporation contracting to provide healthcare to inmates may be liable for customs or policies which violate an inmate's constitutional rights. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). *See also Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010)(stating that such "contractors are treated the same as municipalities for liability purposes in a § 1983 action") (internal citations omitted). Therefore, like municipalities, a corporation that has contracted to provide essential government services may be held liable under § 1983 for violations caused by unconstitutional policies or customs. *See Shields*, 746 F.3d at 789.

A plaintiff may show liability under *Monell* in three ways. First, a plaintiff may establish that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)(en banc) (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff may prove that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690-691). Lastly, a plaintiff may demonstrate liability by establishing a widespread custom. *See Glisson*, 849 F.3d at 379. Liability may extend to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even though they received no formal approval. *See Monell*, 436 U.S. at 91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).

A widespread custom may be established by evidence of policymaking officials' knowledge of and acquiescence to the unconstitutional practice. *See McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). This standard is similar to that required to show deliberate indifference. A plaintiff may show that officials knew of and acquiesced to a risk created by a custom or practice, but nevertheless failed to take steps to protect the plaintiff. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *McNabola*, 10 F.3d at 511 (quoting *Brown v. City of*

*Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). If officials would be required to make a new rule or regulation in order to end the unconstitutional policy, the failure to do so is also sufficient evidence of acquiescence. *See Thomas*, 604 F.3d at 303 (citing *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)). Similarly, senior officials may be liable if they personally created the policies, practices, or customs at issue. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002).

Plaintiff alleges, without evidence, that "Dr. Ritz's only reason for existence is to deny outside referrals." (Doc. 61, p. 6). He points out that Dr. Ritz denied Plaintiff's request for a referral to an ENT three times and alleges that this is circumstantial evidence of a policy of Wexford to deny referrals to outside specialists in order to lower costs. *Id.* There is no evidence in the record to support this claim. Instead, when asked during his deposition, Dr. Ritz expressly denied that this was the reason behind Wexford's decision to deny referrals to outside specialists. (Doc. 57, Exh. G, 4:18-22). Instead, the utilization management committee examines the medical necessity of the requested procedures in order to approve or deny them. *Id.* at 5:22.

Plaintiff likewise provides no evidence that the collegial review process Wexford employed resulted in any other denials aside from the denial of his referral to an ENT. This is insufficient to find that Wexford had a widespread custom of denying such referrals. A plaintiff may demonstrate a defendant's actual or constructive knowledge through one of two evidentiary paths: (i) a theory predicated on a prior pattern of similar constitutional violations; or (ii) a "single-incident" theory predicated on an obvious, but

disregarded, risk demonstrated by a violation of a single person's constitutional rights. *See J.K.J v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020). *See also Id.* at 389 (Brennan, J. dissenting in part)(acknowledging that majority's decision was based on "single-incident theory"); *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997)(finding that, in "a narrow set of circumstances[,]" a plaintiff may show *Monell* violations with a "single-incident" theory of liability).

Under the first evidentiary path, it is not impossible for a plaintiff to show a widespread practice or custom using only personal experience, though it is "necessarily more difficult" for that plaintiff to differentiate the alleged practice from a "random event." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)(citing *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)) (internal quotations omitted). The Seventh Circuit has not adopted a bright-line quota defining how many examples are sufficient to constitute a widespread custom. *See Id.* However, the Seventh Circuit has consistently declined to find such a custom when plaintiffs can show only a few instances of unconstitutional conduct over a long period of time. *See, e.g., Thomas*, 604 F.3d at 303 (noting that there must be, at least, more than three examples of unconstitutional conduct) (internal citations omitted); *Doe v. Vigo Cty.*, 905 F.3d 1038, 1045 (7th Cir. 2018)(rejecting a widespread policy argument when the plaintiff pointed to five incidents spread over more than twenty years); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005)(holding that three instances of improper pepper-spraying over three years did not establish a widespread custom); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir.

2002)(finding that three instances of improperly denying rightful owners their vehicles from impoundment lots over four years did not constitute a widespread policy). Plaintiff has only a single denied referral on which to rely, or, at best, three instances in which that referral was denied over a period of two years. This cannot support finding a widespread custom under the first evidentiary path.

Under the second evidentiary path, a plaintiff may show actual knowledge of an unconstitutional policy or custom by demonstrating that the risk of violation was "so obvious that the failure to do so could properly be characterized as deliberate indifference to constitutional rights." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (internal quotation marks omitted). *See also Bryan County*, 520 U.S. at 410 (stating that the key question is whether the defendant "disregarded a known or obvious consequence" of their actions). Such knowledge can be established if the defendants ignore a "moral certainty" that harm will result due to the defendants' choices to disregard a known risk. *Glisson*, 849 F.3d at 382 (internal citations omitted). However, Plaintiff provides no evidence that denying referrals to an ENT constituted such a "moral certainty." Indeed, the Wexford Defendants point out that Plaintiff received care which would otherwise ensure that his throat condition would not cause him harm, including monitoring the condition with a CT and an x-ray. (Doc. 57, p. 21). As Plaintiff provides no evidence on which the Court can determine that Wexford engaged in an unconstitutional policy or custom of denying outside referrals, summary judgment must be granted.

CONCLUSION

For these reasons, the Court **GRANTS** Defendants' motions for summary judgment. (Doc. 56, 58). The Court **DIRECTS** the Clerk of the Court to enter judgment in Defendant's favor with prejudice and to close the case.

**IT IS SO ORDERED.**

**DATED:  September 29, 2022.**

Digitally signed
by Judge Sison 2
Date: 2022.09.29
12:11:46 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**